UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------- X

JOHN TORRACO and WILLIAM
WINSTANLEY,

                    Plaintiffs,

    - against -

PORT AUTHORITY OF NEW YORK &
NEW JERSEY, et al.,

                    Defendants.

-------------------------------------------------------- X

**MEMORANDUM
DECISION AND ORDER**

05 Civ. 5572 (BMC)

FILED
IN CLERK'S OFFICE
U.S. DIST. COURT E.D.N.Y.
MAR 18 2008
P.M.
TIME A.M.

**COGAN**, District Judge.

The two plaintiffs in this action have alleged claims under 42 U.S.C. §1983
arising from separate incidents. The unifying element is that with regard to each incident,
plaintiffs assert that defendants failed to recognize plaintiffs' rights under 18 U.S.C.
§926A ("§926A"), a statute which, under certain circumstances, allows gun owners to
transport their firearms interstate without incurring criminal liability under local gun
laws.

The case is before me on defendants' motion for summary judgment. For the
reasons set forth below, the motion is granted.

### BACKGROUND

#### I. John Torraco

Mr. Torraco is a resident of Florida, an attorney licensed there and in the District
of Columbia, and the owner of an Astra pistol. On October 15, 2004, he flew from

Florida to La Guardia Airport with his then-wife. He went from LaGuardia to stay with his mother in Franklin Lakes, New Jersey. He owns a different property in Franklin Lakes, which he leases to his father, and his pistol was left there while he was in Franklin Lakes. Two days later, on October 17, 2004, Mr. Torraco's mother drove him and his wife back to Queens, intending to make a stop at a friend's house in Queens before going on to LaGuardia. However, after arriving at the friend's house, they apparently decided to have Mr. Torraco's friend drive them to the airport after their brief visit, which he did, instead of Mr. Torraco's mother. The unloaded pistol was transported during the trip from New Jersey to the friend's house, and then to LaGuardia, in a carrying case.

Upon check-in at the airport, Mr. Torraco advised the airline ticket agent that he was carrying a pistol in a case and wanted to check it through with his luggage. He had previously researched the procedure for transporting firearms under federal law and believed he was in compliance. The airline ticket agent tagged the firearm with an orange firearms declaration tag and checked it through. She also advised him that it was standard operating procedure to notify the Port Authority Police when a passenger declares a weapon, which she did.

Defendant Police Officer Anthony Espinal arrived at the scene and inquired as to whether Mr. Torraco had a New York license for the firearm. Mr. Torraco, specifically identifying 18 U.S.C. §926A, explained that federal law preempted any local licensing requirements, and allowed him to transport the firearm. Officer Espinal was unfamiliar with the statute. He therefore called his superior, defendant Sgt. Lawrence Goldberg.

Sgt. Goldberg testified at deposition that upon arriving on scene, he asked Mr. Torraco and his wife which of them possessed the gun, but that neither of them

responded, which he considered to be evasive. He asked them two or three more times, finally telling them that if one of them did not acknowledge possession, he would take them both in for further investigation. Mr. Torraco then acknowledged that the firearm was his. Sgt. Goldberg asked if he had a New York permit, to which Mr. Torraco explained that under 18 U.S.C. §926A, he didn't need one. Sgt. Goldberg asked if he had any documentation showing that he was lawfully in possession of the gun.[1] Mr. Torraco continued to assert that he needed no such documentation to transport the weapon through New York under federal law.

At some point prior to or during this conversation, a Transportation Security Administration ("TSA") Supervisor, Melvin Birch, arrived at the scene. He took the position that Mr. Torraco was correct, and that under federal law, Mr. Torraco was permitted to transport the weapon without regard to local law.[2] Sgt. Goldberg understood the agent to be saying that the weapon was properly packaged in accordance with federal regulations, but that was irrelevant to him. Sgt. Goldberg stated that unless Mr. Torraco could establish legal possession, the federal statute did not override New York State law prohibiting the carrying of firearms.[3] Thus, notwithstanding Agent Birch's position, Sgt. Goldberg and Officer Espinal arrested Mr. Torraco and his wife for a violation of New

---

[1] Mr. Torraco had no specific recollection of such a request, but acknowledged that Sgt. Goldberg may have so inquired. I therefore consider that fact undisputed. The only dispute about the conversation appears to be one of characterization: from Mr. Torraco's perspective, Sgt. Goldberg was wholly ignorant of 18 U.S.C. §926A, and was fixated on the absence of a New York permit, while from Sgt. Goldberg's perspective, his request was not so limited; he was looking for some kind of documentation showing Mr. Torraco to be the lawful owner or in lawful possession, including, for example, a bill of sale.

[2] Defendants object to consideration of Agent Birch's statements on the ground of hearsay. The statements, to which Sgt. Goldberg testified, are admissible at least on the issue of probable cause as they form part of the information that he had in determining to make an arrest. They are therefore not being offered for the truth of the matters asserted, and do not constitute hearsay. See Fed.R.Evid. 801(c).

[3] Mr. Torraco describes Sgt. Goldberg's response as arrogant, to the effect that this was New York and federal law doesn't apply. The actual tone is immaterial for purposes of this motion.

York Penal Law §265.01(1), Possession of a Firearm in the Fourth Degree: "A person is guilty of criminal possession of a weapon in the fourth degree when ... [h]e possesses any firearm." When asked at deposition upon what basis he determined to make the arrest, Sgt. Goldberg testified:

> Mr. Torraco had a weapon within [the] confines of the State of New York. I tried to determine that he was legally in possession of the weapon. I could not do so, based on the fact that he could not produce any kind of documentation, ownership, possession, bill of sale, any kind of licensing permits, anything else. ...
>
> [The decision to arrest was] based on the evasiveness and not responding to me initially and not having any documentation.

Mr. Torraco was held until the next day, when he was arraigned in Queens County Criminal Court on the charge. (The record does not show what happened to Mr. Torraco's former wife, but since she is not a plaintiff here, it does not appear to be material.) He was apparently released on bail or recognizance. His attorney moved to dismiss on the ground of federal preemption. The motion was carried to April 6, 2005; the District Attorney failed to respond to the motion, although he cross-moved to dismiss in the interests of justice. The Court denied the District Attorney's motion and granted Mr. Torraco's motion, finding that the failure to respond to Mr. Torraco's motion was a concession on the merits.

## II. William Winstanley

Mr. Winstanley resides in Westchester. He owns three firearms (at least) for which he has permits. On April 1, 2005, he went to JFK Airport to board a flight for Phoenix. He declared the guns to the ticket agent, and again as per standard operating procedure, she called Port Authority Police. Defendant Officer Paulson arrived at the

scene and requested, and was shown, the permits for the weapons and Mr. Winstanley's driver's license. He asked Mr. Winstanley if he had an Arizona permit. Mr. Winstanley advised Officer Paulsen that he did not need a permit to openly carry a weapon in Arizona, but that he did have a Florida permit, which permitted him to carry a concealed weapon in Arizona. Officer Paulsen disagreed, and Mr. Winstanley asked to speak to Officer Paulsen's supervisor. Officer Paulsen told Mr. Winstanley that if he persisted in asking to speak to a supervisor, he (Officer Paulsen) would place Mr. Winstanley under arrest. He said that Mr. Winstanley would not be permitted to board the aircraft with the firearms.

Mr. Winstanley changed his flight to the next day, apparently anticipating that the delay in getting approval to board with the firearms would cause him to miss his scheduled flight, and there were no other flights on his ticketed airline that day. He then made his way to the Port Authority Police Headquarters at JFK, and spoke to an unidentified Lieutenant. After some discussion and delay, the Lieutenant agreed with Mr. Winstanley that he did not need a permit in Arizona, but by that time, Mr. Winstanley had indeed missed his flight.

The next day, Mr. Winstanley returned to the airport to try to get another flight. He was told by another officer (who is unidentified) the he had the wrong type of carrying case, although it was one that Mr. Winstanley had used for years. He bought a compliant gun case from the airline without delay, and apparently would have made that flight, but the flight was canceled due to weather and there were again no other flights on his ticketed airline going out that day. The next day, after making some unsuccessful telephone calls to the Port Authority police at JFK to try to pre-clear his transport of the

firearms, he returned to JFK, and was permitted to board the flight to Arizona, checking through his pistols upon producing his New York permit and driver's license.

## III. The Complaint

Plaintiffs allege five claims for relief: (1) under §1983, injunctive relief against the Port Authority and Sgt. Goldberg, enjoining them from enforcing local law in derogation of 18 U.S.C. §926A; (2) under 28 U.S.C. §2201, declaratory relief against these same defendants, declaring them in violation of federal law for failing to apply 18 U.S.C. §926A; (3) under §1983, for damages against the individual police officer defendants in favor of Mr. Torraco; (4) under §1983, for damages against the individual police officer defendants in favor of Mr. Winstanley; (5) under §1983, for damages against the Port Authority and its policymakers in favor of both plaintiffs.

Plaintiffs' legal theories are not entirely clear. For Mr. Winstanley, who only missed his flight, the claim appears to be that (a) his right to travel was infringed; and (b) §926A creates an independent right to transport firearms, which was also infringed. Mr. Winstanley contends that both of these rights are enforceable by an action for damages under §1983. For Mr. Torraco, who was arrested, the claim is either or both that Sgt. Goldberg violated: (a) his Fourth Amendment right to be free from unreasonable search and seizure; and (b) his independent right to carry firearms under §926A. Again, Mr. Torraco seeks to enforce one or both of these rights under §1983.

## DISCUSSION

### I. Standard for Summary Judgment

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c): see Yourman v. Giuliani, 229 F.3d 124, 131 (2d Cir.2000). The moving party bears the burden of informing the district court of the basis for its motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986). The nonmoving party must set forth specific facts showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505 (1986). "[A]ll reasonable inferences must be drawn against the [moving] party," and summary judgment may not be granted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir.2001).

### II. Section 926A as the predicate for a §1983 action[4]

#### A. Section 1983 as a means to redress violations of federal law

Section 1983 is more than a vehicle for the enforcement of Constitutional rights; by its terms, it is the procedural means for asserting liability for violations of the "rights, privileges, or immunities secured by the Constitution *and laws*" of the United States. 42 U.S.C. §1983 (emphasis added). See Maine v. Thiboutot, 448 U.S. 1, 100 S.Ct. 2502

---

[4] Defendants' papers are peculiarly organized in addressing this issue. It was barely mentioned in their moving brief, and only with respect to Mr. Winstanley's claim, although it seems just as applicable to Mr. Torraco's claim. Even in their reply brief, where it is addressed in a bit more detail as to both plaintiffs, it is included only as part of their assertion that the police officer defendants are entitled to qualified immunity. I am addressing §926A as the threshold issue that I think it is.

(1980). Nevertheless, not every violation of a federal statute gives rise to a §1983 action. This is because "[s]ection 1983 speaks in terms of rights, privileges, or immunities, not violations of federal law." Golden State Transport Corp. v. City of Los Angeles, 493 U.S. 103, 106, 110 S.Ct. 444, 448 (1989).

The Supreme Court has had numerous occasions to consider what federal statutory violations fall within the scope of a damages action under §1983. Its most recent pronouncement is Gonzaga University v. Doe, 536 U.S. 273, 122 S.Ct. 2268 (2002), in which it held that a state actor's violation of the Family Educational Rights and Privacy Act of 1974 (FERPA), 20 U.S.C. §1232g, which prohibits federal funding to schools that release student records without their parents' consent, would not support a claim under §1983. In harmonizing its prior decisions in this area, the Court laid out a number of principles, several of which are important here.

First, although the issue of whether §1983 provides a damages remedy for violation of a particular federal statute is distinct from the issue of whether that federal statute provides an implied private right of action, the issues are closely related because the initial inquiry in both analyses is whether Congress "intended to create a federal right." 536 U.S. at 283, 122 S.Ct. at 2275 (emphasis in original). Thus, "the initial inquiry– determining whether a statute confers any right at all–is no different from the initial inquiry in an implied right of action case, the express purpose of which is to determine whether or not a statute 'confer[s] rights on a particular class of persons." Id. at 285, quoting, California v. Sierra Club, 451 U.S. 287, 294, 101 S.Ct. 1775 (1981).

Second, to support a conclusion that Congress intended to create enforceable rights, the text of the statute in question "must be phrased in terms of the persons

benefitted." Id. at 284. The Court contrasted FERPA, which prohibits the Secretary of

Education from federal funding of non-compliant institutions, with Title VI and Title IX

of the Civil rights act of 1964, which provide that "[n]o person" shall "be subjected to

discrimination." FERPA's prohibition is directed at the Government, and thus cannot be

the basis for damages under §1983, while the latter statutes expressly provide a protected

status to the beneficiary, and suggest the creation of independently enforceable rights.

Third, the Court went to some length to explain what is meant by "conferring a

benefit" on the plaintiff. Invoking a concept that seems parallel to the distinction between

intended and incidental beneficiaries in contract law, the Court held that it is not enough

for the plaintiff to "fall[] within the general zone of interest that the statute is intended to

protect." Id. at 283. The question remains whether Congress "intended to confer individual

rights upon a class of beneficiaries." Id. at 285.

Gonzaga refined the analysis from two prior cases that had addressed the reach of

§1983 to remedy federal statutory violations. In Blessing v. Freestone, 520 U.S. 329,

340-41, 117 S.Ct. 1353, 1359 (1997), the Court looked to three factors which it has

traditionally considered to determine the existence of a federal right:

> First, Congress must have intended that the provision in question benefit
> the plaintiff. Second, the plaintiff must demonstrate that the right
> assertedly protected by the statute is not so "vague and amorphous" that its
> enforcement would strain judicial competence. Third, the statute must
> unambiguously impose a binding obligation on the States. In other words,
> the provision giving rise to the asserted right must be couched in
> mandatory, rather than precatory, terms.

(internal quotations and citations omitted). Applying these factors, the Court held that

Title IV-D of the Social Security Act, which obligates States to pursue fathers for child

support, did not allow single mothers to sue the State under §1983 for failing in that obligation.

Blessing, in turn, built upon the Court's decision in <u>Golden State Transit Corp. v. City of Los Angeles</u>, 493 U.S. 103, 110 S.Ct. 444 (1989), the most recent decision in which the Court recognized a damage action under §1983 for violation of a federal statute. There, the Court held that the National Labor Relations Act preempted any state action to affect the outcome of labor strikes (the City had refused to renew taxi owners' franchises unless they ended their labor dispute with the drivers' union). The Court ruled that the NLRA created a right on the part of employers and union to use whatever economic weapons they had at their disposal, and the state actors' interference with that right, tilting the playing field in favor of the union, gave rise to a damage action under §1983 in favor of the employers. Focusing on the issue of private rights arising from preemption, the Court distinguished preemption in which Congress intends to free private individuals from government interference, <u>see</u> <u>Machinists v. Wisconsin Employment Relations Comm'n</u>, 427 U.S. 132, 96 S.Ct. 2548 (1976), from preemption implemented to accomplish uniform, national policy, <u>see</u> <u>San Diego Building Trades Council v. Garmon</u>, 359 U.S. 236, 79 S.Ct. 773 (1959). Only where the purpose of preemption is to create private rights will an action lie under §1983 for violation of the preemptive statute.

The Second Circuit has also recently examined the availability of §1983 to redress state action that violates the alleged preemptive effect of federal law. In <u>NextG Networks of NY, Inc. v. City of New York</u>, 513 F.3d 49 (2d Cir. 2008), the statute in question was §253 of the Telecommunications Act of 1996, 47 U.S.C. §253. The plaintiff there complained that the City's rules, regulations, and requirements in the

City's Charter were illegally denying it access to City-owned telephone poles pursuant to a complex and changing set of bidding requirements for such access. This, according to the plaintiffs, violated their rights under subsection §253(a), which provided: "No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." The Second Circuit held that the plaintiff had failed to show that the statute was intended to benefit an identified class of plaintiffs, as opposed to the public at large. The Court read §253(a) "to place limits on state and local governments, rather than as intended to benefit an identified class of putative plaintiffs." It also focused particularly on a savings clause, subsection (c) of the statute, which provided:

> Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

Id. at §253(c). This language, according to the Court, showed that the purpose of the statute was only to impose "some limits" on local regulation of telecommunications access, "but not to interfere with the right of such governments to impose reasonable charges." 513 F.3d at 53.

Similarly, in Loyal Tire & Auto Center, Inc. v. Town of Woodbury, 445 F.3d 136 (2d Cir. 2006), the plaintiff brought an action under §1983, among other claims, seeking damages from application of a town law that required towing companies to maintain a tow yard within one mile of the town police station. The plaintiff claimed that this local ordinance violated 49 U.S.C. §14501(c)(1), a section of the Interstate Commerce Act,

which provided that "[a] State, [or] political subdivision of a State … may not enact a law … related to the price, route, or service of any motor carrier …. " The Court found, based on the language of the statute, that §1983 could not be used to obtain damages for its violation:

> Section 14501(c)(1) requires state and local authorities to refrain from regulating motor carriers of property but does not expressly grant any rights to individual motor carriers. The statute, which provides that a state or municipality may not "enact or enforce" certain kinds of laws governing motor carriers of property, is not "phrased in terms of the persons benefitted." Instead, it forbids certain state and local legislation.

445 F.3d at 150 (internal citation omitted).

However, the "rights versus restrictions" framework does not resolve the issue in every case. In Wachovia Bank, N.A. v. Burke, 414 F.3d 305 (2d Cir. 2005), the statute at issue was the National Bank Act, which expressly preempted competing local regulations with regard to regulatory inspection of the banks: "No national bank shall be subject to any visitorial powers except as authorized by Federal law. …" 12 U.S.C. §484(a). Although this language might have been read as providing a "right" to national banks to be free from state visits, rather than a merely restriction on state action, the Second Circuit held otherwise. Rejecting a "rigid or superficial application of the Blessing factors where other considerations show that Congress did not intend to create federal rights actionable under §1983," 414 F.3d at 322, it found that national banks had a special character, as "agencies of the United States created under its laws to promote its policies," id., quoting, First Nat. Bank of Hartford, Wis. V. City of Hartford, 273 U.S. 548, 550, 47 S.Ct. 462 (1927), which was inconsistent with a Congressional intent to create private rights enforceable under §1983. Drawing from the reasoning in Golden

<u>State</u>, the Court found that because the purpose of the preemptive provision of the National Bank Act was to effectuate national banking policy, rather than merely benefitting each national bank, Congress had not intended to allow recovery of damages under §1983 for violation of the preemptive provision.

  *B. Firearm Owners Protection Act (FOPA), 18 U.S.C. §926A et seq.*

  Section 926A of FOPA, entitled "Interstate Transportation of Firearms," provides that:

> Notwithstanding any other provision of any law or any rule or regulation of a State or any political subdivision thereof, any person who is not otherwise prohibited by this chapter from transporting, shipping, or receiving a firearm shall be entitled to transport a firearm for any lawful purpose from any place where he may lawfully possess and carry such firearm to any other place where he may lawfully possess and carry such firearm if, during such transportation the firearm is unloaded, and neither the firearm nor any ammunition being transported is readily accessible or is directly accessible from the passenger compartment of such transporting vehicle: *Provided*, That in the case of a vehicle without a compartment separate from the driver's compartment the firearm or ammunition shall be contained in a locked container other than the glove compartment or console.

18 U.S.C. §926A. FOPA, which was passed in 1986, consisted of a series of amendments, of which §926A was one, to the Gun Control Act of 1968, 18 U.S.C. §921 *et seq.*

  Perhaps more than any of the statutes at issue in the cases discussed above, the language of §926A suggests that it is specifically directed at granting rights to beneficiaries, not merely prohibiting or limiting government action. It uses the term "entitled," and the subject of the sentence is "any person," not a governmental authority. Indeed, the reference to prohibiting government interference, buried as a limiter under the word "notwithstanding," merely emphasizes the right being granted, and is practically

superfluous; even without the "notwithstanding" clause, the Supremacy Clause might itself prohibit local interference. That contrasts with cases like NextG, where a savings clause makes it clear that federal and local law are to coexist in a federally defined equilibrium.

Although the Gun Control Act has a "savings" clause, 18 U.S.C. §927, to which FOPA is subject, two considerations suggest that this savings clause detracts little from the rights-creating language of FOPA §926A. First, in terms of timing, because §926A was enacted some 18 years after the Gun Control Act, the sequence suggests that Congress intended FOPA to override any pre-existing provisions of the Gun Control Act to the extent the Gun Control Act conflicted with FOPA. More importantly, as savings clauses go, §927 is a rather "soft" savings clause. It provides that:

> No provision of this chapter shall be construed as indicating an intent on the part of the Congress to occupy the field in which such provision operates to the exclusion of the law of any State on the same subject matter, unless there is a direct and positive conflict between such provision and the law of the State so that the two cannot be reconciled or consistently stand together.

Id. All that this provision does is confirm that Congress did not intend field preemption when it entered the business of firearms regulation via the Gun Control Act. Unlike the much broader savings clause in cases like NextG, which recognize and accept local law as co-equal sources for regulating beneficiary and government action, §927 expressly acknowledges that conflict preemption will occur, and when it does, federal law prevails. The language of this kind of savings clause thus supports the conclusion that Congress intended to recognize enforceable rights rather than merely make adjustments to local government conduct.

As <u>Wachovia</u> makes clear, however, just because the language of a preemptive statute suggests a recognition of enforceable rights does not end the inquiry. Not only must courts avoid a mechanical application of the <u>Blessing</u> factors, <u>see</u> <u>Wachovia</u>, 414 F.3d at 322, but the <u>Blessing</u> factors themselves require more. The second of the three <u>Blessing</u> factors obligates a plaintiff to "demonstrate that the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence." 520 U.S. at 340-41, 117 S.Ct. at 1359 (1997). This criteria necessarily includes consideration of practical problems that would arise by allowing a damages action under §1983. In the instant case, because of the statute's allowance for the transport of firearms "for any lawful purpose from any place where he may lawfully possess and carry such firearm to any other place where he may lawfully possess and carry such firearm," those practical problems abound. Although the statute is easily applied to accomplish one goal – preventing conviction under local gun laws for citizens who legally transport firearms between two states (and it in fact accomplished that goal with regard to Mr. Torraco) – its application in the field, to permit real-time transfer of legal firearms interstate in the fast-moving context of trains, planes, and automobiles, without judicial involvement, has, to say the least, severe practical difficulties.

In the instant case, plaintiffs vehemently condemn the lack of training with which the Port Authority provided its police force with respect to §926A. But that was only the smaller part of the reason why Mr. Torraco was arrested and Mr. Winstanley missed his flight. The more elemental reason was that the officers in the field were not familiar with New Jersey, Florida, and Arizona law with respect to possessing and carrying firearms. Even if they had familiarity with §926A, that statute alone would not have answered the

question of whether plaintiffs were entitled to rely upon it. They had to know the law of the places to which plaintiffs had traveled and were traveling to determine if §926A applied.

Yet it is simply too much to read into §926A a Congressional intent to require local police to have on-the-spot knowledge of the firearms laws of all 50 States. I say "50 States" because, although it might be tempting to focus on the jurisdictions involved here, since New Jersey is within the Port Authority's jurisdiction and Florida and Arizona are on heavily used flight paths from New York, the logical extension of plaintiffs' theory would require familiarity with the gun laws of every State. Some of those States have few firearms restrictions; some have many. Most require permits to purchase; some permit home or business possession; some require licensing to carry. In many states, either by statute or regulation, different kinds of firearms are regulated in different ways, e.g., by caliber, or barrel length, or even age (of either the firearms or the owner, or both). In addition, may states have varying regulations within the State, either by county or municipality (as does New York). Moreover, since we are of course covering 50 jurisdictions (plus Puerto Rico and the District of Columbia), the certainty of legislative and regulatory amendments and updates would also have to be part of police officers' apparently endless training under plaintiffs' view of §926A. Indeed, although the title of the section shows that its focus is on interstate transport, its language more broadly addresses transport between "places" from and to which the firearm may be lawfully transported, not States, raising the possibility, under plaintiffs' theory, that officers in the

field would have to know foreign country law as well multi-state law to determine whether §926A applies.[5]

There is yet an additional problem that stems from the multi-jurisdictional coverage attempted by §926A. It is not enough, as plaintiffs' argument seems to suggest, if the transporter simply *tells* an officer that he is in the compliance with either §926A or the laws of his departure and destination states. "I haven't done anything wrong" accompanied by a facially plausible explanation is a common enough response in many encounters between the police and suspects. Indeed, Sgt. Goldberg testified that he makes about 50 firearms arrests a year at LaGuardia, and in about half of those, the suspects assert some claim of legal entitlement (although he is not in a position to learn of the disposition of those cases).[6] The statute would make no sense at all if it required an officer to simply accept the oral representation of the suspect without having the legal knowledge base to evaluate the assertion. Yet the practical impossibility of maintaining that knowledge base makes it infeasible to have the officer answer in damages if a gun carrier's assertion turns out to have been correct.[7]

---

[5] Consider, for example, a passenger from Australia, which has complex gun laws that vary from state to state, see A. Rath and G. Griffith, "Firearms Regulation: An Update" (New South Wales Parliamentary Library, October, 1999), available at http://www.parliament.nsw.gov.au/prod/parlment/publications.nsf/0/121a3d471695ba8eca256ecf000af715/$FILE/bg05-99.pdf, who changes planes in Seattle and then New York en route to Maine.

[6] Plaintiffs apparently believe that the vagueness problem is solved pursuant to FOPA §922(g), but that section does not give the officer on the scene much help at all. It merely disqualifies certain individuals from the protection of §926A, e.g., indicted or convicted persons subject to imprisonment for more than one year; fugitives; drug users; mental defectives; dishonorably discharged service members; former U.S. citizens who have renounced citizenship; and those subject to Orders of Protection, among others. This does not address the problem of having to apply multi-jurisdictional standards on the spot. Even as to the disqualified categories, the statute does not advise how the officer is supposed to determine their status when the passenger is about to board a plane, other than taking their word for it.

[7] Plaintiff asserts that the New Jersey State Police have overcome this difficulty by issuing guidelines on how to apply §926A in the field. These guidelines, however, suffer from the same amorphousness as §926A. They essentially advise the officer to conduct a "reasonable inquiry" to conclude whether "the

Nothing could better illustrate the difficulty imposed by plaintiffs' strict liability view of the statute than the parties' passionate disagreement concerning whether Mr. Torraco was in compliance with New Jersey law when he left New Jersey for New York with his firearm in tow.[8]  Citing the New Jersey Code of Criminal Justice, N.J.S.A. 2C:39-5, which allows a gun owner to keep or carry a firearm at his "business" or "residence," defendants argue that because Mr. Torraco took the gun from his father's house in New Jersey, which Mr. Torraco owned, to his mother's house in New Jersey, which he did not own, he was in violation of State law, and hence not entitled to the protection accorded interstate transport under §926A.  Plaintiffs fire back that there is no evidence that Mr. Torraco brought the gun from his father's house to his mother's house (although I do not see how the gun wound up at LaGuardia without making the stop with Mr. Torraco at his mother's house in New Jersey on the way to LaGuardia).  Plaintiffs

person's possession is lawful under New Jersey law or 18 U.S.C.A. §926A."  Plaintiffs' Ex. 8 (These guidelines are apparently from a website; plaintiffs have submitted no evidence as to how or if they are disseminated or instructed upon to New Jersey State Troopers.)  They offer no clue as to how the officer is to measure the responses he gets against the law of jurisdictions of which he cannot reasonably be expected to have knowledge.

[8] I am not sure why the parties spend so much energy on this issue, as it is not one upon which the case turns; assuming there is a §1983 damage action for an arrest in derogation of §926A, the issue is whether Sgt. Goldberg had probable cause to think that Mr. Torraco had violated the law, not whether he actually violated it.  In making that determination, Sgt. Goldberg had very few facts before him – most fundamentally, he knew that Mr. Torraco had no documentation for his gun – yet defendants, at least, refer to considerably more facts to show that Mr. Torraco was not carrying in compliance with either New Jersey or New York law and thus could not have claimed protection under §926A.  Since Sgt. Goldberg's decision to arrest must be evaluated on the basis of what he knew, without consideration of extraneous facts, see Ricciuti v. N.Y. City Transit. Auth., 124 F.3d 123, 128 (2d Cir. 1997), the correct disposition upon all relevant facts under §926A was something that should have been asserted in Queens County Criminal Court, not here.

I will note, however, that Mr. Torraco was not entitled to the protection of §926A for at least one reason that he did not disclose to Sgt. Goldberg – his stop at his friend's house in Queens before going on to the airport.  Plaintiff characterizes the visit as "brief," but §926A does not allow a diversion to visit a friend on the way to the airport while carrying a gun any more than it allows a short shopping trip to Bloomingdale's on the way to the airport while carrying a gun.  There may be "necessary" interim stops in transporting a firearm to its ultimate destination, like staying over in an airport hotel to make an early morning flight, which would fall within §926A by implication, cf. N.J.S.A. 2C:39-6g (expressly providing for "deviations as are reasonably necessary" in carrying a firearm between two authorized points), but that was not Mr. Torraco's situation when he chose to make a social call.

also argue that because New Jersey law allows portage of the firearm "between one place of business or residence and another *when moving*," N.J.S.A. 2C:39-6(e) (emphasis added), Mr. Torraco was in compliance, because he was "moving" to Florida and the New Jersey statute, according to plaintiffs, is intended to have extraterritorial effect to enable that out-of-state move (although it is curious that Mr. Torraco already owned a house in Florida, had been living there, and was domiciled there). He also relies on subsection (g) of that statute, which allows, in the course of such a move, "such deviations as are reasonably necessary under the circumstances." N.J.S.A. 2C:39-6(g).

Of course, Mr. Torraco disclosed none of his prior intrastate movements, either in New Jersey or New York, to Sgt. Goldberg or Officer Espinal. This is probably just as well, as I am not sure how an officer in the field could be expected to make a decision concerning a legal issue upon which the parties here so strongly, and in good faith, disagree. Multiply the fluidity of that scenario by 50 jurisdictions (putting aside issues that might arise as a result of international travel with interim domestic stopovers), and nearly a billion passengers moving through U.S. airports per year,[9] and it becomes apparent that providing a damage remedy under §1983 for a failure to adequately apply §926A would be unworkable. Congress' choice of the phrase "for any lawful purpose from any place where he may lawfully possess and carry such firearm to any other place where he may lawfully possess and carry such firearm" is the type of "vague and amorphous" language that <u>Blessing</u> holds will not support a claim for damages under §1983.

---

[9] U.S. Dep't of Transportation Press Release, "December 2007 Airline Traffic Data: U.S. Airlines Carry Record 769 Million Passengers in 2007" (March 13, 2008), available at http://www.bts.gov/press_releases/2008/bts013_08/html/bts013_08.html.

## II. Mr. Torraco's Fourth Amendment Claims

To the extent Mr. Torraco is claiming violation of his Fourth Amendment rights against unreasonable search and seizure under §1983, as opposed to an action under §1983 to enforce independent rights under §926A, the individual defendants have invoked the defense of qualified immunity.

Consideration of the qualified immunity defense is a two-step inquiry. First, the Court must consider the facts in the light most favorable to the plaintiff, and determine whether the officer's conduct violated the plaintiff's Constitutional rights. Only if the answer to that question is in the affirmative does the Court proceed to the second level of inquiry, namely: (a) was the right clearly established at the time of the defendant's actions; or (b) even if the right was clearly established, was the officer objectively reasonable in believing in the lawfulness of his actions? See Walczyk v. Rio, 496 F.3d 139, 154 (2d Cir. 2007); Connecticut v. Crotty, 346 F.3d 84 (2003).

### A. Violation of Constitutional Rights

Proceeding to the first issue, whether Sgt. Goldberg violated Mr. Torraco's right against unreasonable arrest, the issue is not whether Mr. Torraco was in fact guilty of the crime for which he was arrested. Rather, the issue of whether his rights were violated turns on whether there was probable cause to believe that a crime had been committed. For this reason, Mr. Torraco's statement of the issue as "if Torraco complied with 18 U.S.C. §926A, then his arrest ... was objectively unreasonable under the Fourth Amendment" is wrong. Guilt or innocence is not the issue. The issue is probable cause, and that requires a more careful analysis of the facts known to the arresting officer.

Probable cause exists if a police officer has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." Weyant v. Okst, 101 F.3d 845, 852 (2d Cir.1996). Probable cause is "a fluid concept ... not readily, or even usefully, reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. 213, 232, 103 S.Ct. 2317 (1983). Although probable cause requires something more than a "mere suspicion," it also requires a lesser showing than a *prima facie* case of criminal conduct. Id. at 235. Probable cause does not demand any showing that a good-faith belief be "correct[,] or more likely true than false." Texas v. Brown, 460 U.S. 730, 742, 103 S.Ct. 1535 (1983).

In addition, if the material facts are undisputed, the existence or non-existence of probable cause is a question of law, not of fact. See Stewart v. Sonneborn, 98 U.S. 187, 194 (1878) (whether facts alleged to show probable cause are true is a matter of fact, "but whether, supposing them to be true, they amount to a probable cause, is a question of law" (internal quotation marks omitted)). This means, in the context of a motion for summary judgment, that if a plaintiff's version of the facts demonstrates probable cause, then summary judgment in favor of the defendant is appropriate. See Walcyzk, 496 F.3d at 154, quoting, Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151 (2001).

Although the parties dispute the tone of the conversation between Mr. Torraco and Sgt. Goldberg, there is no dispute about the material facts known to Sgt. Goldberg when he determined to make the arrest. He knew that (a) Mr. Torraco had advised the ticket agent that he had a gun that he wished to check through, which was properly packaged pursuant to TSA regulations; (b) Mr. Torraco could produce no documentation

showing his lawful ownership of the gun; (c) Mr. Torraco offered an explanation of federal and state law in an effort to persuade Sgt. Goldberg that his possession was lawful; and (d) Agent Birch supported Mr. Torraco's explanation.

From Mr. Torraco's perspective, the answer to the probable cause question is straightforward. Since Sgt. Goldberg, according to him, never heard of §926A, it follows *ipso facto* that probable cause could not exist. That is incorrect. The standard is one of a "person of reasonable caution," Weyant, 101 F.3d at 852. Although a "person of reasonable caution" does not mean the man on the street, but rather a reasonable police officer, see Saucier v. Katz, 533 U.S. at 202, 121 S.Ct. 2151, we may not simply assume that the average police officer is as conversant with §926 as plaintiffs assume him to be. Plaintiffs' strict liability argument based upon Sgt. Goldberg's lack of knowledge of §926A thus suffers from two unsustainable assumptions.

First, plaintiffs assume that any reasonable officer would be familiar with §926A. Considering the narrowly targeted scope of the statute, the extremely limited authority under it despite more than 20 years since its enactment,[10] and the difficulty of its application in the field described above, there is no justification for that assumption. It is particularly inappropriate to presume universal knowledge of the statute because, as plaintiffs acknowledge, the statute does not effect field preemption, but conflict preemption. This means that only if a particular set of facts exist will the federal statute come into play at all. State and local firearms laws, such as N.Y. Penal L. §265.01(1),

---

[10] The annotations to the statute show three decisions, none of which have any relevance to the facts here. Fresno Rifle and Pistol Club, Inc. v. Van de Kamp, 746 F. Supp. 1415 (E.D.Cal.1990), aff'd, 965 F.2d 723 (9th Cir. 1992); Coalition of New Jersey Sportsmen v. Florio, 744 F.Supp. 602 (D. N.J. 1990); Matter of Two Seized Firearms, , 127 N.J. 84, 602 A.2d 728 (1992).

remain valid, and will in most circumstances be the only relevant authority upon which a local officer needs to be informed in determining whether to make a gun arrest.

Although, in this context, the degree of knowledge of §926A possessed by a "person of reasonable caution" might be considered a question of fact, plaintiffs have submitted insufficient evidence to raise a genuine issue in that regard. All that is known from the present record is that: (a) the Port Authority does not train its officers concerning the statute; (b) TSA, which has a materially different mission than the Port Authority police, apparently does (although it is not clear why Agent Birch considered Mr. Torraco's abbreviated explanation of his ownership – in which he failed to disclose his intrastate movement of the gun in either New Jersey or New York – sufficient, other than taking his word for it); and (c) the New Jersey State Police (who have no more connection to this case than the Idaho State Police, i.e., none), issue guidelines that describe the statute but give no indication as to how officers in the field are to apply it other than to conduct a "reasonable inquiry" to conclude whether "the person's possession is lawful." See n.7 supra. That does not seem like much training at all, and, in any event, it is essentially what Sgt. Goldberg attempted to do by asking for some kind of documentation.[11]

As noted, plaintiffs do not argue that there is a factual issue as to whether a police officer of reasonable caution would be familiar with §926A; they simply assume it. However, even assuming that there is such a factual issue on this record, plaintiffs' theory

---

[11] Plaintiffs' additionally rely on the "expert opinion" of Dr. George L. Kirkham, but that opinion has little, if any, probative value. Although it states that Dr. Kirkham's curriculum vita is annexed, it is not, so there is no information on his background or qualifications. In addition, the opinion states that the defendants' practices are "beyond the pale of widely accepted law enforcement standards and practices," but it gives no basis at all for making that conclusory assertion. All the opinion does is to merely summarize the legal argument in plaintiffs' brief.

suffers from another flawed, and ultimately fatal, duo of assumptions. The first is that a
reasonable officer, aware of the terms of §926A, would not have arrested Mr. Torraco.
That assumption, in turn, rests on a further one -- that a reasonable police officer would
take Mr. Torraco at his word when he explained that his possession was legal under
federal law. However, as discussed above, a police officer who finds someone carrying a
gun in New York City, with no documentation, is not legally obligated to simply take the
suspect's word that his possession is legal when New York law says that it is not. If the
suspect can offer nothing to confirm his defense to what appears to be a clear violation of
New York law, the officer is entitled to make the arrest and allow a judge or jury to
determine the sufficiency of the suspect's story.

In Ricciuti v. N.Y.C. Transit Authority, 124 F.3d 123 (2d Cir. 1997), a fight broke
out after a Yankees' game. A bloodied individual pointed out the plaintiff to a police
officer as his assailant. The plaintiff, in turn, vehemently insisted that the alleged victim
had started the fight and he, the plaintiff, had acted only in self-defense, but the officer
arrested the plaintiff for intentional assault. The charges were ultimately dropped. In his
§1983 action, the plaintiff contended that the arrest was objectively unreasonable because
his loud protestations of innocence should have made it clear to the officer that the
plaintiff was acting in self-defense and therefore lacked the requisite intent to commit an
assault. At the very least, according to the plaintiff, the police officer should have
interviewed witnesses and made further inquiries. The Second Circuit, however, rejected
the plaintiff's argument that the officer lacked probable cause to make the arrest:

> Although Officer Lopez would have been entitled to believe Alfred
> Ricciuti's version of events rather than Watson's [the alleged victim], he
> was not required to do so. Given Watson's version of events and his
> visible injuries, a competent police officer could believe it was objectively

reasonable to arrest plaintiff for the assault that had been committed. The officer was not required to make a full investigation into plaintiff's state of mind prior to taking action. Once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest.

Id. at 128, citing, Baker v. McCollan, 443 U.S. 137, 145-46, 99 S.Ct. 2689, 2695-96 (1979) (arresting officers not required to investigate claim of mistaken identity or lack of requisite intent).

Like the instant case, Krause v. Bennett, 887 F.2d 362, 372 (2d Cir.1989), also involved an officer's refusal to accept a suspect's story at face value. A State Trooper spotted what appeared to be a County traffic sign hanging in the suspect's garage. He questioned the suspect about it, who advised him that it had been given to him by a friend in exchange for some plumbing work he had done. He gave the Trooper the name of the friend who had given him the sign. The Trooper inspected the sign, confirmed that it was County property, and without making any effort to locate the friend, obtained a warrant to arrest the plaintiff for intentional possession of stolen property. The charge was dismissed. In setting aside a jury verdict in the plaintiff's favor in the ensuing §1983 action and directing judgment in favor of the Trooper, the Second Circuit held:

> It would be unreasonable and impractical to require that every innocent explanation for activity that suggests criminal behavior be proved wrong, or even contradicted, before an arrest warrant could be issued with impunity. See [Criss v. City of Kent, 867 F.2d 259, 263 (6th Cir.1988)] ('[t]o hold otherwise would be to allow every suspect, guilty or innocent, to avoid arrest simply by claiming 'it wasn't me'). It is up to the factfinder to determine whether a defendant's story holds water, not the arresting officer. Once officers possess facts sufficient to establish probable cause, they are neither required nor allowed to sit as prosecutor, judge or jury. Their function is to apprehend those suspected of wrongdoing, and not to finally determine guilt through a weighing of the evidence.

Id. at 372 (citation omitted).

A gun in the possession of someone who is about to get on a plane presents a potentially much more serious situation than one involving a potentially purloined traffic sign. There is no genuine dispute that Sgt. Goldberg did take some action to try to evaluate Mr. Torraco's defense by asking for some documentation concerning the gun, but Mr. Torraco could give him nothing other than his say-so. A reasonable officer, even one aware of §926A, would be fully justified in not accepting plaintiff's explanation at face value. This is because §926A itself does not answer the question; it requires confirmation of a particular set of facts, which a police officer is not obligated to accept from the mouth of the suspect.

Plaintiffs have difficulty accepting this because from their perspective, §926A covered Mr. Torraco with a bullet-proof umbrella the moment he crossed the New York border from New Jersey. But a reasonable officer would not, and did not have to, see it from that perspective. Based on Mr. Torraco's possession of a firearm in a manner that, absent extraneous facts, violated New York law, and Mr. Torraco's inability to corroborate the facts behind his defense, probable cause existed for the arrest.[12]

B. *"Clearly Established" Rights and "Objective Reasonableness"*

Even if Mr. Torraco's Constitutional rights were violated, Sgt. Goldberg's decision to arrest him is protected by qualified immunity. That is because Mr. Torraco's rights under §926A were far from "clearly established." See Walczyk, 496 F.3d at 154.

---

[12] This discussion has not taken into account Sgt. Goldberg's testimony that he had to ask Mr. and Mrs. Torraco two or three times which of them had the gun before they answered, which Sgt. Goldberg considered evasive. Mr. Torraco no doubt would dispute the characterization of evasiveness, but he has put nothing in the record to contradict Sgt. Goldberg's testimony that he had to put the question multiple times to the Torracos before getting an answer. If that fact is also added to the equation, probable cause becomes even more apparent.

In considering whether Mr. Torraco's rights under §926A were "clearly established," the question "is not answered by reference to how courts or lawyers might have understood the state of the law." Id. Instead, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear *to a reasonable officer* that his conduct was unlawful in the situation he confronted." Saucier v. Katz, 533 U.S. at 202, 121 S.Ct. 2151 (emphasis added). More specifically, "if the right at issue was not clearly established by *then existing precedent*, then qualified immunity shields the defendant." Walczyk, 496 F.3d at 154 (emphasis added). In addition, even if the right at issue was clearly established in certain respects, an officer is still entitled to qualified immunity if "officers of reasonable competence could disagree" on the legality of the action at issue in its particular factual context. Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092 (1986). In this respect, the Supreme Court has observed that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Id.

As can be seen from these legal principles, in a case where the issue of a reasonable officer's knowledge of the law is at issue, the two levels of the inquiry required to determine the availability of qualified immunity tend to overlap. In such situations, as to the first step, the existence of probable cause to arrest depends in part on whether the arrest is objectively reasonable, and objectivity may include the question of what the law provides; as to the second step, determining whether the law is "clearly established" similarly requires consideration of whether a "reasonable officer" would know that his conduct is unlawful under existing law.

However, notwithstanding this overlap, determining whether the law was "clearly established" allows a wider margin of error in evaluating the officer's conduct. The term "arguable probable cause," which is sometimes used to describe this second step of the inquiry, does not mean "almost probable cause," see Gilles v. Repicky, 511 F.3d 239, 246-47 (2d Cir. 2007), but it does focus attention on the word "clearly" established law, and exonerates the officers if reasonable officers could disagree as to what the law is.

For all of the reasons discussed above, the application of qualified immunity to this case is nearly self-evident. It suffices to repeat that there is no reported decision holding a police officer liable for failing to properly apply the statute; there is practically no decisional authority under the statute at all; and the manner in which the statute should operate to allow an officer to assess a suspect's professed compliance is undefined and admits of no ready delineation. The proper means of complying with §926A thus present the epitome of a situation where the law is not "clearly established."

Plaintiffs argue that because the right upon which they are relying is statutory, and indeed is the subject of TSA regulations describing how to pack the firearm, the right upon which Mr. Torraco is suing is firmly established. The conclusion does not follow the premise. Most rights sought to be enforced under §1983 have their origin in written text, whether Constitutional or statutory. In many if not most situations, it takes precedent to give the text adequate definition to clearly establish the right. That is totally lacking here.

Moreover, it is clear that reasonable officers could disagree on the application of §926A. That is, indeed, precisely what happened here, as Agent Birch believed that Sgt. Goldberg should have simply taken Mr. Torraco's word that he was in compliance, while

Sgt. Goldberg believed he needed to see some documentation to corroborate Mr. Torraco's professed justification. Even if an officer in Sgt. Goldberg's position would have known about §926A, neither that officer's nor Agent Birch's position would have been objectively unreasonable.

### III. Mr. Winstanley's Right to Travel

Relying on Saenz v. Roe, 526 U.S. 489, 119 S.Ct. 1518 (1999), and U.S. v. Guest, 383 U.S. 745, 86 S.Ct. 1170 (1966), Mr. Winstanley argues that because Officer Paulsen would not allow him to board the aircraft with his firearm, his Constitutional right to travel interstate without undue interference was infringed.

The right to travel interstate and intrastate is firmly established. The Second Circuit has referred to it as "virtually unqualified." Karpova v. Snow, 497 F.3d 262, 272 (2d Cir. 2007). Most of the cases considering the right to travel involve the denial of crucial benefits to new residents, or the concurrent deprivation of other firmly established Constitutional rights. See e.g., Saenz (1-year residency requirement for welfare benefits); Guest (denial of public facilities used in interstate travel on the basis of race); Memorial Hospital v. Maricopa County, 415 U.S. 250, 94 S.Ct. 1076 (1974) (1-year residency requirement for receiving medical treatment violates right to travel and equal protection). As can be seen from these and other cases enforcing the right to travel, its infringement by state actors always involves a material interference with a person's freedom of movement.

It follows that not every interference with an attempt to travel violates the Constitutional right. In Betancourt v. Bloomberg, 448 F.3d 547 (2d Cir. 2006), for example, homeless plaintiffs challenged a City ordinance that prohibited leaving boxes

and erecting obstructions in public places, as it had been applied to prevent them from setting up cardboard boxes as shelters and moving them from place to place. The Second Circuit declined to find that the prohibition rose to a level that infringed the right to travel. More to the point, in Bach v. Pataki, 408 F.3d 76 (2d Cir. 2005), the non-resident plaintiff claimed that the State's prohibition on issuing gun licenses to non-residents violated his right to travel. The Second Circuit characterized the right to travel claim as one actually arising under the Privileges and Immunities Clause, and rejected it on the ground that the State had a compelling interest in not issuing gun licenses to non-residents, notwithstanding that it would prevent nonresidents from legally traveling to New York with their firearms.

Officer Paulsen did not prohibit Mr. Winstanley from getting on his plane. He prohibited him from getting on his plane with his firearms. Although it is true, as the cases cited above indicate, that interference with as well as prohibition of travel may be actionable, refusal to allow the transport of a firearm is not sufficiently material to infringe upon that right. It does not rise to the level of receiving medical care, see Memorial Hospital; or subsistence benefits, see Saenz; or earning a living, see Connecticut v. Crotty, 346 F.3d 84 (2d Cir. 2003). There was thus no infringement of the right to travel.

**IV. Remaining Claims**

First, since the individual defendants did not violate plaintiffs' rights, there can be no liability against the Port Authority. See Wray v. City of New York, 490 F.3d 189 (2d Cir. 2007).

Second, although this Court's holding that §1983 does not provide a damages remedy for a violation of §926A would not preclude declaratory and injunctive relief to enjoin future violations of the statute, see Loyal Tire, 448 F.3d at 149, the determination that plaintiffs' rights were not violated precludes such relief.

Finally, Mr. Torraco's malicious prosecution claim also fails. A finding of probable cause for an arrest defeats a malicious prosecution claim "unless plaintiff can demonstrate that at some point subsequent to the arrest, additional facts came to light that negated probable cause." Coyle v. Coyle, 354 F.Supp.2d 207, 213 (E.D.N.Y.2005), quoting, Dukes v. City of New York, 879 F.Supp. 335, 342 (S.D.N.Y.1995). Here, however, plaintiffs' theory of changed circumstances is a house of cards. It is built on Sgt. Goldberg testifying that post-arrest, he ran a trace on the gun. Therefore, plaintiffs argue, Sgt. Goldberg learned post-arrest that the gun belonged to Mr. Torraco, and he should have advised the District Attorney. There is nothing in the record, however, that tells us the results of the trace; Sgt. Goldberg did not recall receiving the results. Plaintiffs infer, and ask this Court to imply, that since Mr. Torraco had filled out an Alcohol Tobacco and Firearms form for his pistol, Sgt. Goldberg must have received the results, which would have shown that Mr. Torraco legally possessed the firearm. This speculation is insufficient to dissipate the existence of probable cause.

## CONCLUSION

Defendants' motion for summary judgment is granted, and the case is dismissed.

The Clerk is directed to enter judgment.

**SO ORDERED.**

S/BMC

_____ /U.S.D.J. _____

Dated: Brooklyn, New York
       March 17, 2008